**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| JOHANNA LYNN GREEN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 09-3714 |
| | § | |
| MICHAEL ASTRUE, Commissioner | § | |
| of the Social Security Administration, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND RECOMMENDATION ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT**

This matter was referred by United States District Judge Lee H. Rosenthal, for full pretrial management, pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). (Docket Entry #3). Cross-motions for summary judgment have been filed by Plaintiff Johanna Lynn Green ("Plaintiff," "Green"), and by Defendant Michael J. Astrue ("Defendant," "Commissioner"), in his capacity as Commissioner of the Social Security Administration ("SSA"). (Plaintiff's Motion for Summary Judgment ["Plaintiff's Motion"], Docket Entry #16; Defendant's Cross-Motion for Summary Judgment and Memorandum in Support of Cross-Motion for Summary Judgment ["Defendant's Motion"], Docket Entry #18). Plaintiff has filed a response to Defendant's Motion. (Memorandum in Support of Plaintiff's Response to the Defendant's Cross[-]Motion for Summary Judgment ["Plaintiff's Response"], Docket Entry #20). After considering the pleadings, the evidence submitted, and the applicable law, it is RECOMMENDED that Plaintiff's motion for summary judgment be GRANTED, that Defendant's motion for summary judgment be DENIED, and that this case be REMANDED to the Commissioner for further development of the record.

**Background**

On May 12, 2006, Plaintiff Johanna Lynn Green filed an application for Social Security Disability Insurance Benefits ("DIB"), under Title II of the Social Security Act ("the Act"). (Transcript ["Tr."] at 108-16). On September 11, 2006, she filed an application for Supplemental Security Insurance ("SSI") benefits, under Title XVI of the Act.[1]  (Tr. at 117-22).  In her applications, Plaintiff claimed that she had been unable to work since March 27, 2006, due to "fibromyalgia."[2] (Tr. at 152-53).  On July 24, 2006, the SSA denied her applications for DIB and SSI, finding that she is not disabled under the Act.  (Tr. at 75).  Plaintiff petitioned for a reconsideration of that decision, but her claim was again denied.  (Tr. at 20).

On October 25, 2006, Plaintiff requested a hearing before an administrative law judge ("ALJ").  (Tr. at 86-87).  That hearing, before ALJ Clifford Leinberger, took place on July 24, 2008.  (Tr. at 28).  Plaintiff appeared with her attorney, Robert Hardy ("Hardy"), and she testified in her own behalf.  (Tr. at 28).  The ALJ also heard testimony from Dr. Steven Goldstein ("Dr. Goldstein"), a specialist in internal medicine and neurology, and from Byron Pettingill ("Pettingill"), a vocational expert.  (*Id*. at 28, 54).  Following the hearing, the ALJ engaged in the following five-step, sequential analysis to determine whether Green was capable of performing substantial gainful activity or was,

---

[1] While the rules governing DIB and SSI differ, an applicant seeking either benefit must first prove that she is "disabled" within the meaning of the Act.  *See* 42 U.S.C. §§ 423(d), 1382c(a)(3) and (a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

[2] "Fibromyalgia" is "a form of nonarticular rheumatism characterized by musculoskeletal pain, spasm and stiffness, fatigue, and severe sleep disturbance."  MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY 632 (5th ed. 1998).

in fact, disabled:

1.      An individual who is working or engaging in substantial gainful activity will not be found disabled regardless of the medical findings.  20 C.F.R. §§ 404.1520(b) and 416.920(b).

2.      An individual who does not have a "severe impairment" will not be found to be disabled.  20 C.F.R. §§ 404.1520(c) and 416.920(c).

3.      An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will not be considered disabled without consideration of vocational factors.  20 C.F.R. §§ 404.1520(d) and 416.920(d).

4.      If an individual is capable of performing the work she has done in the past, a finding of "not disabled" must be made.  20 C.F.R. §§ 404.1520(e) and 416.920(e).

5.      If an individual's impairment precludes performance of her past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed.  20 C.F.R. §§ 404.1520(f) and 416.920(f).

*Audler v. Astrue*, 501 F.3d 446, 447-48 (5th Cir. 2007); *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991).  It is well-settled that, under this analysis, the claimant has the burden to prove any disability that is relevant to the first four steps.  *See Audler*, 501 F.3d at 448; *Perez*, 415 F.3d at 461; *Wren*, 925 F.2d at 125.  If she is successful, the burden then shifts to the Commissioner, at step five, to show that she is able to perform other work that exists in the national economy.  *See Audler*, 501 F.3d at 448; *Perez*, 415 F.3d at 461; *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001); *Wren*, 925 F.2d at 125.  "'A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis.'"  *Randall v. Astrue*, 570 F.3d 651, 652 (5th Cir. 2009) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)); *accord Audler*, 501 F.3d at 448.

It must be emphasized that the mere presence of an impairment does not necessarily establish a disability.  *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)).  An individual claiming disability insurance benefits under the Act has the burden to prove that she suffers from a disability.  *See Perez*, 415 F.3d at 461; *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988).  A person is disabled only if she is "'unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.'"  *Randall*, 570 F.3d at 653 (quoting 42 U.S.C. § 1382c(a)(3)(A)); *accord Perez*, 415 F.3d at 461.  Substantial gainful activity is defined as "work activity involving significant physical or mental abilities for pay or profit."  *Id*.  A physical or mental impairment is "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  *Randall*, 570 F.3d at 657 (citing 42 U.S.C. § 423(d)(3)).  Further, the impairment must be so severe as to limit the claimant so that she "'is not only unable to do her previous work but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work'" which exists in the national economy.  *Id*. (quoting 42 U.S.C. § 423(d)(2)(A)).

Based on these principles, as well as his review of the evidence, the ALJ determined that Green suffers from fibromyalgia, and that this impairment is "severe." (Tr. at 22).  He also found that she suffers from headaches, but that they are not "severe." (Tr. at 23).  He concluded that none of Green's impairments, or any combination of impairments, meets, or equals in severity, the medical criteria for any disabling impairment listed in the applicable SSA regulations. (Tr. at 23).  Next, the ALJ found that Green has the residual functional capacity ("RFC") to perform semi-

skilled, sedentary work.  (Tr. at 24-27).  Drawing from the evidence, the ALJ found that Green's RFC does not preclude a return to her past relevant employment as an "invoice control clerk."  (Tr. at 26).  With that, the ALJ concluded that Green "has not been under a disability, as defined in the Social Security Act, from March 27, 2006 through the date of this decision."  (Tr. at 27).  On February 8, 2009, Plaintiff requested a review of the ALJ's decision.  (Tr. at 7, 16).  SSA regulations provide that the Appeals Council will grant a request for a review if any of the following circumstances is present:  "(1) there is an apparent abuse of discretion by the ALJ; (2) an error of law has been made; (3) the ALJ's action, findings, or conclusions are not supported by substantial evidence; (4) there is a broad policy issue which may affect the public interest."  20 C.F.R. §§ 404.970 and 416.1470.  On September 14, 2009, the Appeals Council denied her request, finding that no applicable reason for review existed.  (Tr. at 2-5).  With this ruling, the ALJ's decision became final.  *See* 20 C.F.R. §§ 404.984(b)(2) and 416.1484(b)(2).

On November 12, 2009, Green filed this suit, pursuant to section 205(g) of the Act (codified as amended at 42 U.S.C. § 405(g)), to challenge that decision.  (Plaintiff's Original Complaint ["Complaint"], Docket Entry #1).  Subsequently, the parties filed cross-motions for summary judgment.  Having considered the pleadings, the evidence submitted, and the applicable law, the court recommends that Plaintiff's motion for summary judgment be granted, that Defendant's motion for summary judgment be denied, and that this case be remanded to the Commissioner for further development of Green's physical impairments.

**Standard of Review**

Federal courts review the Commissioner's denial of disability benefits only to ascertain whether the final decision is supported by substantial evidence and whether the proper legal

5

standards were applied.  *See Randall*, 570 F.3d at 655; *Newton*, 209 F.3d at 452 (citing *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999)).  "If the Commissioner's findings are supported by substantial evidence, they must be affirmed."  *Id.*  "'Substantial evidence is more than a scintilla, less than a preponderance, and is such that a reasonable mind might accept it as adequate to support a conclusion.'"  *Randall*, 570 F.3d at 662 (*quoting Randall v. Sullivan*, 956 F.2d 105, 109 (5th Cir. 1992)); *accord Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995).  On review, the court does not "reweigh the evidence, but . . . only scrutinize[s] the record to determine whether it contains substantial evidence to support the Commissioner's decision."  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *see Randall*, 570 F.3d at 662; *Carey v. Apfel*, 230 F.3d 131, 146 (5th Cir. 2000). In making this determination, the court must weigh the following four factors:  the objective medical facts; the diagnoses and opinions from treating physicians on subsidiary questions of fact; Plaintiff's own testimony about his pain; and Plaintiff's educational background, work history, and present age. *See Wren*, 925 F.2d at 126.  If there are no credible evidentiary choices or medical findings that support the Commissioner's decision, then a finding of no substantial evidence is proper.  *See Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001) (quoting *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000)).

**Discussion**

Before this court, Plaintiff challenges the ALJ's findings on three grounds.  First, she claims that the ALJ did not consider all of the relevant evidence in determining whether she was disabled. (Plaintiff's Response at 3-4).  Plaintiff also argues that there is no substantial evidence that she can perform a full range of sedentary work.  (*Id*. at 6-11).  Finally, she complains that the ALJ erred in assessing her credibility.  (*Id*. at 4-5).  Defendant insists, however, that the ALJ properly considered

all of the available evidence, and followed the applicable law, in determining that she is not disabled.  (Defendant's Motion at 1, 9).

### *Medical Facts, Opinions, and Diagnoses*

The earliest relevant medical records show that Plaintiff was treated, from February 22, 2005, through June 20, 2006, by Dr. Albert Gelders ("Dr. Gelders"), a family practitioner.  (Tr. at 194-209, 262-66).  On February 22, 2005, Green complained to Dr. Gelders about "worsening generalized body aches" that she had been suffering for the last few months.  (Tr. at 207).  She also told Dr. Gelders that she was suffering from interstitial cystitis.[3]  (*Id*.)  Green told the doctor that her pain "start[s] in the joints and radiates everywhere in her body," and that it interferes with her sleep. (*Id*.).  Dr. Gelders examined Green, and found that she had "multiple trigger points bilateral deltoids, scapulae, hips, sacrum."  (*Id*.).  Dr. Gelders stated that Plaintiff's "[p]resentation is certainly consistent with fibromyalgia."  (*Id*.).  He prescribed fluoxetine,[4] Elavil,[5] and Neurontin,[6] and requested another exam in one month to "see what kind of response we are getting."  (*Id*.).  On May 20, 2005, Dr. Gelders wrote that Green "reports dramatic improvement in her symptoms with the current regimen," and that her primary complaint at that time was "fatigue, worse in the afternoon." (Tr. at 206).  He recommended that Plaintiff decrease the dosage of, or eliminate, the Elavil to aid her sleep and to increase her energy in the daytime.  (*Id*.).  At their next appointment, on July 19,

---

[3] "Interstitial cystitis" is "an inflammation of the bladder, believed to be associated with an autoimmune or allergic response."  *Id*. at 856-57.

[4] "Fluoxetine" is "an oral antidepressant that acts by selectively preventing serotonin uptake."  *Id*. at 647.

[5] "Elavil" is a trademark for amitriptyline hydrochloride, a tricyclic antidepressant.  *See* PHYSICIAN'S DESK REFERENCE 3115 (56th ed. 2002); DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 573 (29th ed. 2000).

[6] "Neurontin" is "an anti-epileptic medication . . . [that] affects chemicals and nerves in the body that are involved in the cause of seizures and some types of pain."  DRUGS.COM, *http://www.drugs.com/neurontin.html*.

2005, Green informed Dr. Gelders that she had hurt her back two days earlier at work, when "stepping backward off [her] desk" to hang decorations.  (Tr. at 204).  She told him that she "was quite sore the next day," but that "today she does not have any pain."  (*Id.*).  Dr. Gelders concluded that Green "may continue her medications for fibromyalgia," and that she could return to work. (*Id.*).

On August 9, 2005, Green complained to Dr. Gelders that she was "still having considerable generalized body pain."  (Tr. at 202).  She also told him that she was experiencing "significant weakness," primarily in her lower extremities, and that, "[a]t times, she feels she cannot even walk." (*Id.*).  Dr. Gelders performed a neurological exam, noted that Green "walks almost in a slight waddle," and reported that her left foot turns out slightly more than her right.  (*Id.*).  He did not find evidence of more serious neurological impairments, but wanted her to get a second opinion from a neurologist.  (*Id.*).  Dr. Gelders noted in his records that Green was suffering from fibromyalgia and from "[l]ower extremity weakness by report."  (*Id.*).  He changed her medication from fluoxetine to Effexor.[7]  (*Id.*).  On September 16, 2005, Green complained to Dr. Gelders that her condition was getting worse. (Tr. at 200).  She told him that her legs were "twitching constantly when she is trying to sleep," that she was having "spasms all over," and that there was a knot in her left gluteus muscle that was sensitive to touch.  (*Id.*).  She also complained that she was "in pain all the time."  (*Id.*). Dr. Gelders determined that Green was suffering from fibromyalgia and from restless leg syndrome,[8]

---

[7] "Effexor" is another antidepressant medication.  *See* Physicians Desk Reference 3392 (57th ed. 2003).

[8] "Restless leg syndrome" is "a benign condition of unknown origin characterized by an irritating sensation of uneasiness, tiredness, and itching deep within the muscles of the leg, especially the lower part of the limb, accompanied by twitching and sometimes by pain."  Mosby's at 1410.

8

and he gave her a two-week sample of Requip[9] to see if it relieved her symptoms.  (*Id.*).  On January

6, 2006, Green returned to Dr. Gelders for a followup appointment, and he reported the following:

> Johanna is in [sic] very frustrated with her fibromyalgia symptoms.  She is still
> looking for alternatives to doing nothing.  She wishes to see a pain management
> specialist for which I am referring her out.  I have also filled out her FMLA
> paperwork today.  She had many, many questions regarding fibromyalgia and
> alternative diagnosis.  I continued to stress that I believe that there is no alternative
> diagnosis to her condition at this point.

(Tr. at 199).  Dr. Gelders did, however, agree to order a "heavy metal screen" blood test, because

Green had uncovered research that there may be a "loose connection between fibromyalgia and

heavy metal toxicity."  (*Id.*).  The test revealed only a slightly elevated level of zinc in her blood,

which Dr. Gelders "did not think [was] a significant number, but [could not] be sure since zinc is

associated with myalgia."[10]  (Tr. at 198).  Dr. Gelders did his own research on the topic, but found

nothing that helped Green.  (*Id.*).  In March 2006, Dr. Gelders affirmed his diagnosis of

fibromyalgia. (Tr. at 197).  He also stated that he believed Green was in need of psychological

support to understand and accept her condition.  (Tr. at 196-97).

On June 5, 2006, Dr. Gelders reported that Green's condition had worsened.  (Tr. at 194).

He wrote. however, that, from a psychological standpoint, Green "seems to have finally accepted

the fact that . . . she most likely has" fibromyalgia.  (*Id.*).  Dr. Gelders also noted that Green asked

for  a letter to her employer stating that she was unable to work for an additional two months.  (*Id.*).

He stated that he refused, telling Green that he was only willing to write a note that she would be

---

[9] "Requip," a trademark for ropinirole, is a medication originally developed for the treatment of Parkinson's Disease and is sometimes prescribed to treat fibromyalgia and restless leg syndrome.  *See* Andrew J. Holman, *Treatment of Fibromyalgia: A Changing of the Guard*, 1 WOMEN'S HEALTH 409-20 (Nov. 2005), found at *http://www.futuremedicine.com*.

[10] The term "myalgia," also called "myoneuralgia," refers to "diffuse muscle pain, usually accompanied by malaise."  MOSBY'S at 1065.

"indefinitely disabled" because of fibromyalgia.  (Tr. at 194, 262).  He explained that, "At this point I do not think she is going to be going back [to work] any time in the near future," and did not want to "mislead her employer."  (*Id.*).  In his letter, Dr. Gelders advised Plaintiff's boss that she could not work because of fibromyalgia, and that she could not be expected to return to employment before January 1, 2010.  (Tr. at 263).  Dr. Gelders's treatment records also show that he examined Plaintiff a number of times, ordered regular blood tests, and arranged for x-rays and MRIs.  (*See, e.g.*, Tr. at 213-28).

On September 6, 2005, Dr. Gelders sent Green to Dr. Bettina Harner ("Dr. Harner"), a neurologist, for a consultation regarding "bilateral leg weakness."  (Tr. at 229-48).  Green told Dr. Harner that she suffers from "constant low back pain and radicular pain to both legs" and intermittent numbness in her legs.  (Tr. at 235).  Following an examination, Dr. Harner determined that Green was suffering from "bilateral upper and lower extremity pain and burning parasthesias."[11] (Tr. at 234).  Her preliminary diagnosis was "skin sensation disturb[ance]," for which she prescribed Lyrica.[12]  (*Id.*).  Dr. Harner also stated, "I think she may have fibromyalgia."  (Tr. at 236).  The doctor scheduled a lumbar puncture, as well as MRIs of Green's spine and brain, to rule out demyelinating disease[13] or a cervical spinal cord lesion.  (Tr. at 234, 236).  On October 3, 2005, Green's MRIs revealed "significant magnetic susceptibility," likely caused by a dental artifact such

---

[11] "Paresthesias" is defined as "[a]n abnormal sensation, such as burning, pricking, tickling, or tingling." STEDMAN'S MEDICAL DICTIONARY 1316 (27th ed. 2000).

[12] "Lyrica" is an anti-epileptic drug that "also affects chemicals in the brain that send pain signals across the nervous system."  DRUGS.COM, *http://www.drugs.com/lyrica.html*.  It is "used to control seizures and to treat fibromyalgia."  *Id.*

[13] "Demyelinating disease" involves "the destruction . . . of the myelin sheath from a nerve or nerve fiber." MOSBY'S at 458.

as a filling, that prevented a clear view of certain parts of the brain.  (Tr. at 248).  On November 14,

2005, an MRI of the lumbar spine revealed "no evidence of disc herniation or spinal stenosis,"[14] but

"mild degenerative changes of the facet joints at L5-S1."  (Tr. at 247).  Green saw Dr. Harner for

a follow-up examination on November 23, 2005, prior to the lumbar procedure.  (Tr. at 233).  She

told the doctor that she still suffered from pain and numbness, and that she also "feels weak in her

legs."  (*Id*.).  Green reported on that day that she had recently been diagnosed as suffering from

interstitial cystitis.  (*Id*.).

Dr. Harner performed the lumbar puncture on December 2, 2005.  (Tr. at 231).  In her

pre-procedure notes, she reported that Green complained of pain in her hands, as well as in her back

and legs, and claimed no relief from the Lyrica.  (*Id*.).  The results of the lumbar puncture are not

made clear.  On December 13, 2005, an MRI of Green's cervical spine revealed no abnormalities,

although it was noted that a metallic artifact, probably "dental in nature," had obscured some of the

view.  (Tr. at 245).  On March 8, 2006, Dr. Harner reported that she had not found "any evidence

of neurologic etiology of [Green's] diffuse body pain."  (Tr. at 229-30).

From December 16, 2005, through January 6, 2006, Plaintiff was treated by Dr. Gharrett

Johnson ("Dr. Johnson"), a chiropractor.  (Tr. at 267-68).  Dr. Johnson found that Green had

"restricted head, neck, mid and low back movement"; "restricted and painful cervical and lumbar

range of motion"; "hypoesthesia[15] of C8-T1 and L1-3"; "motor strength deficit of deep cervical,

upper extremity and trunk muscles . . . due to pain"; and like symptoms.  (Tr. at 267).  He ordered

---

[14]  "Spinal stenosis" is "an abnormal condition characterized by the constriction or narrowing" of the spinal cord.  *Id.* at 1539.

[15]  "Hypoesthesia" is "a decrease in sensation in response to stimulation of the sensory nerves or body organs or areas they innervate."  *Id*. at 797.

11

spinal x-rays, which revealed "[m]ultiple spinal rotations . . . in the cervicothoracic and c-spine, [and] pelvic rotation," but no fracture or "boney pathology."  (*Id.*).  He noted that Green had been diagnosed as suffering from fibromyalgia, but that she also reported a minor car accident earlier that year.  (Tr. at 268).  Dr. Johnson concluded that Green's symptoms "appeared more likely related to the chronic effects of the fibrosis of repair due to whiplash associated disorder," a possible result of the car accident, than to fibromyalgia.  (*Id.*).  He also reported that Green seemed able to "sit, stand, walk, lift, carry, handle objects, hear, speak and travel without impairment."  (*Id.*).  However, he did note that, during the course of her treatment, "Green appeared to be experiencing genuine discomfort and distress."  (*Id.*).  Dr. Johnson diagnosed Plaintiff as suffering from lumbrosacral neuralgia, sciatic neuritis, and cervical neuralgia.[16]  (*Id.*).

On January 5, 2006, Plaintiff was treated at the Central Valley Pain Management and Wellness Clinic.  (Tr. at 249-50).  Green complained of constant pain throughout her body, particularly in her legs, arms, back, and face.  (Tr. at 249).  She described the pain as "burning, stabbing, throbbing, aching, and electrical," and said that it felt "like the pain [was] in her bones." (*Id.*).  She also reported that she was unable to sleep.  (*Id.*).  Green was examined by Dr. Patrick Rhoades ("Dr. Rhoades"), a pain management specialist, who noted that her "[f]ibromyalgia points [were] mostly not painful."  (*Id.*).  Dr. Rhoades then diagnosed Plaintiff's condition, as follows:

> Chronic diffuse body pain of unknown etiology.  She doesn't have fibromyalgia tender points, but she exhibits many qualities consistent with fibromyalgia.  I think there is a significant possibility of fibromyalgia, but certainly not a classic presentation.

(Tr. at 249-50).  He recommended the use of a Duragesic patch, and prescribed Cymbalta and

---

[16] "Neuritis" is "an abnormal condition characterized by inflammation of a nerve."  *Id.* at 1099.  One sign of this condition is "neuralgia," which involves "severe stabbing pain."  *Id.* at 1098-99.

Lunesta, to help relieve Green's pain and insomnia.[17]  (Tr. at 250).  On January 30, 2006, Green

returned to the clinic for a follow-up examination.  (Tr. at 251-52).  On that day, she was seen by

Dr. Glenhall Taylor ("Dr. Taylor"), who specializes in pain management, psychiatry, and neurology.

(*Id*.).  Plaintiff told Dr. Taylor that she had suffered an allergic reaction to the Duragesic patch and

had gone to a local emergency room, and received an injection of Demerol.[18]  (*Id*.).  Dr. Taylor

found that Green suffered from "widespread tenderness," including "actual tender points for

fibromyalgia." (*Id*.).  Dr. Taylor diagnosed Green as suffering from fibromyalgia and from "reactive

depression."  (*Id*.).  He renewed her prescriptions for Cymbalta and Lunesta, and agreed to the trial

of Requip that had been suggested by Dr. Gelders.  (*Id*.).

On February 21, 2006, Plaintiff went to Dr. James Shoemaker ("Dr. Shoemaker"), an

internist, complaining that her "legs hurt [and] burn[ed]."  (Tr. at 212).  Dr. Shoemaker diagnosed

Green as suffering from chronic fatigue syndrome.[19]   (Tr. at 209-12).

On June 28, 2006, Plaintiff went to Westside Orthopaedic and Sport Medical Associates

("Westside"),[20] where she was examined by Dr. Steven Nolan ("Dr. Nolan"), an orthopedic surgeon.

(Tr. at 276-77).  Green complained about pain that radiated from her back, "down both legs to [her]

heels," and described it as "constant and aching."  (Tr. at 276).  Green told Dr. Nolan that she

---

[17] "Cymbalta" is an anti-depressant medication that "is also used to treat . . . fibromyalgia."  DRUGS.COM, *http://www.drugs.com*.  "Duragesic" is "a narcotic (opioid) pain medicine."  *Id*.  "Lunesta" is a sedative that "affects chemicals in your brain that may become unbalanced and cause sleep problems (insomnia)."  *Id*.

[18] "Demerol" is a "narcotic pain reliever[.]"  *Id*.

[19] "Chronic fatigue syndrome" is "a condition characterized by disabling fatigue, accompanied by a constellation of symptoms, including muscle pain, multijoint pain without swelling, painful cervical or axillary adenopathy, sore throat, headache, impaired memory or concentration, unrefreshing sleep, and postexertional malaise."  MOSBY'S at 336.

[20] Plaintiff was referred to Westside by a Dr. Gene Cohen ("Dr. Cohen").  (Tr. at 269).  None of Dr. Cohen's records appears to have been included in the administrative transcript.

obtained some relief with sleep, but that her symptoms worsen when she is active. (*Id.*). Dr. Nolan examined Plaintiff's lumbar spine, and found some limitations in her range of motion, as well as "bilateral symetric mild clonus[21] on forced passive extension of the feet." (*Id.*). He also performed "straight leg raise testing,"[22] and got a positive result. (*Id.*). Dr. Nolan diagnosed Plaintiff as suffering from "chronic left and chronic right low back pain" and "lumbar radiculopathy."[23] (Tr. at 277). He referred her to a neurologist, Dr. Herbert Edmundson, Jr. ("Dr. Edmundson"), for treatment. (Tr. at 269-75).

Dr. Edmundson first examined Green on July 6, 2006. (Tr. at 270-75). He performed a series of tests, and noted the following results:

> This nerve study and EMG is remarkable for a mild or early left median neuropathy. Otherwise, there is no evidence of peripheral neuropathy, cervical or lumbrosacral radiculopathy.

(Tr. at 274). Dr. Edmundson ordered additional lab work, and prescribed Medrol and Celebrex for pain, as well as Depakote and Fioricet for Plaintiff's headaches.[24] (Tr. at 272, 315-29). Green saw Dr. Edmundson again on July 18, 2006. (Tr. at 311-14). At that appointment, Green reported "a greater than 80% reduction in her neck, buttock, and extremity pain." (Tr. at 311). However, she

---

[21] The medical term "clonus" refers to "an abnormal pattern of neuromuscular activity, characterized by rapidly alternating involuntary contraction and relaxation of skeletal muscle." MOSBY'S at 253.

[22] A "straight leg raise" test is "a physical examination technique to determine abnormality of the sciatic nerve or tightness of the hamstrings." *Id.* at 1546. The presence of sciatica yields a positive result, and "is confirmed by sciatic nerve pain radiating down the limb when the supine person attempts to raise the straightened limb." *Id.*

[23] "Radiculopathy" is a "[d]isorder of the spinal nerve roots." STEDMAN'S at 503.

[24] "Celebrex" is a "nonsteroidal anti-inflammatory drug[.]" DRUGS.COM, *http://www.drugs.com*. "Depakote" is a medication that "affects chemicals in the body that may be involved in causing seizures," and is also used to treat migraine headaches. *Id.* "Fioricet" is a medication commonly "used to treat tension headaches that are caused by muscle contractions." *Id.* "Medrol," a trademark for "methylprednisolone," is a steroid medication that is "used to treat many different conditions such as allergic disorders, skin conditions, ulcerative colitis, arthritis, lupus, psoriasis, or breathing disorders." *Id.*

reported no improvement to her headaches.  (*Id.*).  Dr. Edmundson performed a neurological exam

and noted considerable improvement, although he found "reduced vibration sensation in both lower

extremities."  (Tr. at 312).  He elected to keep Plaintiff on anti-inflammatory medications, and

prescribed Topamax[25] to treat her headaches.  (Tr. at 312-14).  Dr. Edmondson lowered the dosage

of Topamax on August 2, 2006, after Green called to report that it was "not helping her headache."

(Tr. at 306, 309).  Plaintiff returned to Dr. Edmundson on August 7, 2006.  (Tr. at 306-08).  She

reported that "she has been headache free on th[e] lower dose" of Topamax.  (Tr. at 306).  However,

she complained of "recurrent musculoskeletal symptoms that were previously diagnosed as

fibromyalgia."  (*Id.*).  Following a neurological examination, Dr. Edmundson diagnosed Green as

suffering from lower back pain, pain in her limbs, and headaches, and he prescribed medication for

those symptoms.  (Tr. at 307).

On July 3, 2006, Green went to Dr. Armando Jarquin ("Dr. Jarquin"), a family practitioner,

complaining of pain in her lower back, hip, and legs.  (Tr. at 259).  Dr. Jarquin advised her to

continue with the current treatment plan, and to use heating pads for additional pain relief.  (*Id.*).

On July 5, 2006, Dr. Kavitha Reddy ("Dr. Reddy"), a family practitioner, assessed Green's

residual functional capacity, on behalf of the state.  (Tr. at 278-85).  The doctor named fibromyalgia

as the only significant diagnosis.  (Tr. at 278).  Based on the medical evidence in the record, Dr.

Reddy found that Green had certain exertional limitations, including the ability to lift or carry no

more than 50 pounds occasionally and 25 pounds frequently, and to sit, stand, or walk for no more

than six hours in an eight-hour workday.  (Tr. at 279).  She also found, however, that Plaintiff was

not limited in her ability to push or pull, other than the weight restrictions cited.  (*Id.*).  Dr. Reddy

---

[25] "Topamax" is "a seizure medication" that "is also used to prevent migraine headaches in adults."  *Id.*

15

found that Green had no limitations in the following areas:  posture; manipulation; vision; communication; and environment.  (Tr. at 280-82).  She concluded that the "[a]lleged limitations are not fully supported by [the medical records] and other evidence."  (Tr. at 283).

On July 19, 2006, Green was treated by Dr. Javier Canon ("Dr. Canon"), an orthopedist at the Richmond Bone and Joint Clinic, for "lumbar spine and bilateral leg pain."  (Tr. at 253-58). After an examination, Dr. Canon diagnosed Plaintiff as suffering from "myofascial[26] pain syndrome."  (Tr. at 257).  He prescribed Tramadol[27] for pain, as well as four weeks of physical therapy.  (*Id*.).  Green had a follow-up appointment with Dr. Canon on August 23, 2006.  (Tr. at 286-88).  Dr. Canon examined her, and found that she suffered from fatigue, leg and back pain, swelling in her legs, shortness of breath, anxiety, and sleep issues.  (Tr. at 286-87).  He also stated that Green suffered from "weakness, numbness, [and] headache."  (Tr. at 287).  He further found that Green exhibited "[d]iffuse muscle tenderness with palpation" and  "diffuse joint pain."  (*Id*.). Dr. Canon diagnosed Plaintiff as suffering from myofascial pain, and noted the following:

> Patient would benefit from psychotherapy and a comprehensive approach considering her ongoing psychosocial issues/stressors.  Patient appears depressed and will benefit from medication and psychiatric follow up.   Patient unwilling to get further reassurance from this provider.

(Tr. at 287-88).

A letter from Dr. Stuart Marmorstein ("Dr. Marmorstein"), a chiropractor, shows that Green was treated at his office on two occasions in August 2006.  (Tr. at 330).  Dr. Marmorstein stated that, on August 11, 2006, Green complained of "pain from lower back [and] down legs" that began in

---

[26] The term "myofascial" means "pertaining to a muscle and its fascia."  MOSBY'S at 1073.  "Fascia" is "the fibrous connective tissue of the body that may be separated from other specifically organized structures, such as the tendons, the aponeuroses, and the ligaments."  *Id*. at 616.

[27] "Tramadol" is "a narcotic-like pain reliever."  DRUGS.COM, *http://www.drugs.com*.

February 2005.  (*Id*.).  Green told the doctor that the pain "[i]nitially came and went," but that it started to worsen, and spread into her arms, so that she now had constant pain "everywhere."  (*Id*.). She also claimed to suffer from migraines, irritable bowel syndrome, and interstitial cystitis.  (*Id*.). Dr. Marmorstein noted that Green could not "sit in a chair and type more than 23 or 30 min[utes]" and could not "stand any length of time."  (Id.).  He also reported that Green's pain worsened with increased activity.  (*Id*.).  Dr. Marmorstein performed some "adjustments" of Green's joints, and reported that she felt "much better."  (*Id*.).  Green returned to Dr. Marmorstein on August 18, 2006, reporting that she had "[h]ad a couple of good days," but was again suffering from pain.  (*Id*.).  She told him that her leg pain, in particular, was interfering with her ability to sleep.  (*Id*.).  It appears that Dr. Marmorstein performed some additional "adjustments," after which he noted that Green's "[m]uscles all work."  (*Id*.).

Other records show that Green was treated by InterAction Physical Therapy ("InterAction") in August 2006.  (Tr. at 331-39).  On August 21, 2006, Green went to InterAction for an evaluation of her spine.  (Tr. at 336).  That exam revealed a marginal positive "head/forward shoulder prosetation," "diffuse myofascial tenderness," and hypersensitivity to pain.  (*Id*.).  It was also noted that Green was emotionally upset at the appointment, appeared to be depressed, and had a "pain dominating mindset."  (*Id*.).  Green's therapist found that her strength and range of motion were somewhat limited in certain areas due to pain.  (Tr. at 337).  Green was diagnosed as suffering from fibromyalgia and "diffuse myofascial pain," and a plan of physical therapy, including aquatic therapy, was ordered.  (Tr. at 336, 338).  The next record shows that, at an aquatic therapy session on August 24, 2006, Green "required several rest breaks," and that her pain left her with a "low exercise tolerance" that day.  (Tr. at 333).  Her therapist, Katrina Stanford ("Ms. Stanford"), wrote

that Green had difficulty with many of her exercises, and noted that she would "likely progress very slowly." (*Id*.). Green had aquatic therapy with Ms. Stanford again on August 28, 2006, and reported that she "felt a little better" and was not experiencing "excessive fatigue." (Tr. at 331). Green apparently showed some improvement during the session, and Ms. Stanford stated that they would "continue to progress gradually." (*Id*.).

From September 11, 2007, through November 13, 2007, Plaintiff was treated at Ben Taub General Hospital ("Ben Taub") for chronic pelvic pain, which was ultimately determined to be endometriosis and interstitial cystitis. (Tr. at 341-411). The Ben Taub records show that Green also complained about constant back pain that radiated to her legs and interfered with her daily activities. (Tr. at 341-45, 365). She was referred to a neurologist and a pain specialist. (*Id*.). On October 16, 2007, Green underwent a complete hysterectomy. (Tr. at 349, 357-61, 384-86). She was discharged from the hospital on October 19, 2007. (Tr. at 372).

On February 27, 2008, Green was treated by Dr. Marvin Tarrant II ("Dr. Tarrant"), a family practitioner, for "lower lumbar pain." (Tr. at 413-17). Dr. Tarrant examined her, and made note of the following:

> On inspection no misalignment, no asymmetry, no skin lesions. On palpation no masses, no tenderness, good rom [range of motion]. Some pain with rom, straight leg raising, and flex knee on abdomen does not increase in pain.

(Tr. at 415). Dr. Tarrant also ordered a series of x-rays, which revealed evidence of early degenerative disc disease. (Tr. at 433). Ultimately, Dr. Tarrant diagnosed Plaintiff as suffering from "lumbar pain," and he prescribed a pain relieving cream. (Tr. at 416-17).

From August 2008, through June 2009, Plaintiff was treated by Dr. Donna Bloodworth ("Dr. Bloodworth"), a psychiatrist who specializes in pain management. (Tr. at 450-548). While Dr.

18

Bloodworth's records are difficult to decipher, it appears that, in August 2008, she diagnosed Green as suffering from fibromyalgia, including "chronic lower [to] upper body pain," with a high level of anti-nuclear antibodies ("ANA").[28]  (Tr. at 506-07,  515-16).  It also appears that, in October 2008, Dr. Bloodworth diagnosed Green as suffering from Sjörgren's syndrome,[29] and from stiffness of the joints in the hand. (Tr. at 529, 547-48).  In later months, Dr. Bloodworth diagnosed Green as suffering from burning feet syndrome,[30] myalgia, and myositis.  (Tr. at 509-13, 542-45).

On February 10, 2009, Green told Dr. Bloodworth that she had "chronic pain in the muscles and the sense that they are moving or cramping under the skin and that pounding on them might feel better."  (Tr. at 477, 484).  At an appointment on March 17, 2009, Dr. Bloodworth reported that Green was suffering from "whole body pain and stiffness especially the calves with muscle spasms, elevated ANA and burning foot pain, [and] borderline osteopenia."[31]  (Tr. at 474).  At another appointment, in April 2009, Dr. Bloodworth diagnosed Green as suffering from chronic pain syndrome and SI joint dysfunction.  (Tr. at 466).  The doctor noted that Plaintiff had experienced relief from her symptoms with Bacoflen,[32] but that she had to discontinue the medication because it caused a severe rash.  (Tr. at 465).  Throughout her records, Dr. Bloodworth referred to the fact that Plaintiff suffered from a variety of negative side effects from many of the medications she had

---

[28] An "anti-nuclear antibody" is "an autoantibody that reacts with nuclear material."  MOSBY'S at 107.  This type of antibody is "found in the blood serum of patients with rheumatoid arthritis, systemic lupus erythematosus, Sjörgren's syndrome, polymyositis, and a number of nonrheumatic disorders."  *Id.*

[29] "Sjörgren's syndrome" is "a immunologic disorder characterized by deficient moisture production," and "is frequently associated with Raynaud's phenomenon, rheumatoid arthritis," and other autoimmune disorders.  *Id.* at 1498.

[30] "Burning feet syndrome" is "a neurologic disorder characterized by symptoms of a burning sensation in the sole of the foot."  *Id.* at 239.

[31] "Osteopenia" is "a conditon of subnormally mineralized bone."  *Id.* at 1169.

[32] "Bacoflen" is "a muscle relaxer and an antispastic agent."  DRUGS.COM, *http://www.drugs.com*.

tried.  (*See, e.g.*, Tr. at 445-91).

On March 14, 2009, Plaintiff was treated at the emergency room at Christus St. Catherine Hospital ("St. Catherine's") for a severe generalized skin rash that had reportedly been troubling her for the past four months.  (Tr. at 439-47).  While Green was at St. Catherine's, the nurse inquired about her pain overall.  (Tr. at 442).  Green told the nurse that she was experiencing pain "all over" at a level of "10" on a 0 to 10 point scale, and described the pain as a "burning" sensation.  (*Id.*). Green also reported that it interfered with her sleep, her appetite, her activity level, her relationships, her emotions, and her concentration.  (*Id.*).  Green was treated with IV medication for the rash.  (Tr. at 442).

From April 15, 2009, through April 30, 2009, Green underwent a neuropsychological and general diagnostic evaluation by Dr. Paula Haymond ("Dr. Haymond"), a psychologist, on behalf of the state.  (Tr. at 551-65).  The purpose of the evaluation was, as follows:

> to determine Johanna's weaknesses and strengths, motivation for employment, psychological and academic levels of functioning, prognoses, appropriateness of vocational rehabilitation services, the level of support necessary for successful employment and recommendations.

(Tr. at 551).  Dr. Haymond noted first that Green's "recount of personal, family, social, medical, and occupational history seemed fairly accurate."  (*Id.*).  She also observed that Green appeared well dressed and groomed, oriented times three, and "verbally fluent and self expressive."  (Tr. at 554). She further reported, however, that, at their initial appointment, she "determined that [Green] could not complete the entire evaluation in one appointment [because] she seemed able to do only a few hours of work at a time."  (*Id.*).  As a result, Dr. Haymond divided up the evaluation into four different sessions.  (*Id.*).  Dr. Haymond tested Green's IQ on the Wechsler Adult Intelligence

Scale-III ("WAIS-III"),[33] which revealed a verbal score of 76, a performance score of 91, and a full

scale score of 81.  (*Id*.).  Regarding these scores, she made the following comment:

> The 15 point difference between Johanna's verbal and performance scale IQ scores
> suggests the possibility of a significant neuropsychological impairment of the left
> cerebral hemisphere.  Such a difference occurs only 17.6% of the time in the general
> adult population.

(*Id*.).  Dr. Haymond administered other tests of Green's cognitive ability, as well as her motor,

behavioral, and personality traits.  (Tr. at 555-64).  She then diagnosed Green as suffering from a

cognitive disorder, a pain disorder with medical and psychological factors, borderline intellectual

functioning, and a histrionic personality disorder.  (Tr. at 564). She gave Green a rating of "45-50"

on the Global Assessment of Functioning ("GAF") scale.[34]  Based on these findings, and the records

of Green's physical condition, Dr. Haymond found that Plaintiff suffered from limitations in the

following functional areas:   "abstract verbal reasoning"; "numerical reasoning"; "retention of

general information"; "social judgment"; "stress management"; "bilateral upper body strength";

"bilateral balance"; "lower body coordination"; "bimanual speed and coordination"; "immediate and

delayed verbal paired associates learning"; "immediate and delayed visual memory for complex

images"; and "delayed logical verbal memory."  (*Id*.).  At the conclusion of her evaluation, Dr.

Haymond wrote that she doubted Green's ability to sustain employment, as follows:

---

[33] The Wechsler Intelligence Scales are "a series of standardized tests used to evaluate cognitive abilities and intellectual abilities in children and adults." THE FREE DICTIONARY, *http://medical-dictionary.thefreedictionary.com*. After the appropriate test is given, "Verbal and Performance IQs are scored based on the results of the testing, and then a composite Full Scale IQ score is computed."  *Id*.

[34] The GAF scale is used to rate an individual's "overall psychological functioning." AMERICAN PSYCHIATRIC INSTITUTE, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV") 32 (4th ed. 1994).  The scale ascribes a numeric range from "1" ("persistent danger of severely hurting self or others") to "100" ("superior functioning") as a way of categorizing a patient's emotional status.  *See id*.  A GAF score in the "41 to 50" range indicates "serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) OR moderate difficulty in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job)."  *Id*. at 34.

> Johanna appears to be suffering a great deal from her physical problems and this is likely to be more intensely experiences [sic] in light of her personality than someone who did not have these factors at work in their profile.  Her ability to work even full [sic] time is highly unlikely as is her ability to work part [sic] time at this point.  Her need for four different appointments to complete this evaluation is viewed as being well outside the norm for most rehabilitation clients evaluated in this office.  She has applied for social security disability benefits and should continue in this pursuit.  She does not appear employable nor a candidate for rehabilitation services at this time.

(Tr. at 565).

### Educational Background, Work History, and Present Age

At the time of the hearing, Green was 34 years old, and had a GED, as well as training as a paralegal.  (Tr. at 33, 158-59).  Her past relevant work included jobs as a paralegal, an administrative clerk, an "invoice control clerk," and a waitress.  (Tr. at 154).

### Subjective Complaints

In her applications for benefits, Plaintiff claimed that she has been disabled, and unable to work, since March 27, 2006, due to "fibromyalgia."  (Tr. at 152-53).  Green also completed a daily activity questionnaire, in which she stated that her physical problems limit her in the following ways:

> Pain in my back and legs prevents me from standing and sitting in a chair for long periods of time.

(Tr. at 169).  She claimed, as well, that pain interferes with her ability to concentrate.  (*Id*.).  Green stated that she suffers on a daily basis, but that "some days are worse than others."  (*Id*.).  She wrote that "decreased activity" and "no working" help to alleviate some of her pain.  (*Id*.).  In the same questionnaire, Plaintiff stated that she exercises by "stretch[ing]" and "walk[ing] for one hour everyday."  (Tr. at 170).  In addition, she stated that, on an average day, she is "able to rest, relax, and provide education activities for [her] children."  (*Id*.).  Further, she claimed that her physical

22

problems limit her ability to sit, stand, walk, lift, use her hands, bend, kneel, climb, reach, hear, speak, drive, read, watch television, use the telephone, and do house and yard work. (*Id.*). Plaintiff concluded that her "condition is so bad [that she] wouldn't wish it upon anyone." (Tr. at 171). Green later amended her application to include migraine headaches, carpal tunnel syndrome, and an inability "to sit or stand for any length of time" as impairments that preclude employment. (Tr. at 177).

At the hearing before the ALJ, Plaintiff testified that she suffers from pain on a consistent basis, although it is more intense on some days than others. (Tr. at 45). She testified that her pain is worse on stormy days. (Tr. at 53). Plaintiff also testified that she has difficulty sleeping, that she has been gaining weight, and that she has low energy. (Tr. at 47). Green testified, as well, that her condition causes her emotional pain, particularly when she considers that she is relatively young, and when she thinks about how her condition is affecting her children. (Tr. at 48).

Plaintiff testified that, on March 27, 2006, the alleged onset date of her disability, she had been working for Verizon. (Tr. at 36-37). She told the ALJ that she was fired by Verizon because she was missing too much work because of her medical condition. (Tr. at 36). She testified that, following her termination, she was unemployed until May 2007, when she found a part-time job, or "contract work," as a bookkeeper. (Tr. at 36-38). Green also testified that, from April 1, 2008, through June 13, 2008, she tried to work full time, for a real estate firm, but that "they let [her] go because [she] could not sustain 40 hours a week for them." (Tr. at 44-45). Regarding her part-time job, Plaintiff testified that her employer gave her the flexibility she needed. (Tr. at 48). She testified that her employer allowed her to make her own hours, and to take a break or go home whenever she felt unable to work. (*Id.*). She testified further that her employer would allow her to miss work for

23

multiple days in a row, after which she could "get caught up" at her own pace.  (Tr. at 52-53).

Green testified that she lives with her two children, and that she drives "almost daily," mostly to and from work, to the grocery store, and to doctors' appointments.  (Tr. at 34-35).  She also testified that she attends school and church functions when she is able to do so.  (Tr. at 46-47).  She told the ALJ that she can handle her personal needs without assistance, although "[o]n bad days [she] do[es] very little."  (Tr. at 41).  Green testified that her sons do most of the cooking, and that she divides the housekeeping chores with them.  (Tr. at 42-43, 45-46).  Green also testified that, in her work as a bookkeeper, she works in an office, and that she uses a computer and a copy machine.  (Tr. at 41, 53).  She reported that she performs the following functions, as well:

> I receive bills.  I pay those bills through the Quickbook database.  I invoice clients, [seek] reimbursement of those bills and keep track of those records.

(Tr. at 41, 66).  She also testified, however, that she never uses the computer she has at her home because "it's too painful."  (Tr. at 42).  Plaintiff told the ALJ, as well, that her fingers become stiff and painful when she tries to write.  (Tr. at 51-52).

Green also testified that, "[o]n a good day, . . . I can walk a couple blocks," "stand for a couple of hours," and sit for "[a] couple of hours."  (Tr. at 39-40).  She explained that, "[t]he problem is the more activity I do, the worse the pain gets."  (*Id*.).  She testified that, as a result, simply changing positions to relieve pain actually causes her more pain.  (*Id*.).  Plaintiff told the ALJ that she can bend, that she can push and pull such things as a grocery cart, and that she can reach her arms over her head.  (Tr. at 40-42).  She testified, however, that, even on a good day, she cannot lift items weighing more than three pounds, that she cannot stoop, and that she has difficulty squatting.  (Tr. at 40-42, 51).  Green told the ALJ that she has a number of "bad days" each month. (Tr. at 52).

24

### *Expert Testimony*

The ALJ also heard from Dr. Steven Goldstein, a neurologist. (Tr. at 54-65). Dr. Goldstein based his testimony both on the record and on Green's comments at the hearing. (Tr. at 54-55). He testified that there is evidence that Green suffers from fibromyalgia, from headaches, and, likely, from carpal tunnel syndrome. (Tr. at 55-58). Dr. Goldstein noted, however that he was "not sure that the record documents that [the fibromyalgia] diagnosis is correct." (Tr. at 61-62). He specifically challenged Dr. Gelders's fibromyalgia diagnosis as lacking any support in that physician's own records. (Tr. at 62-63). Dr. Goldstein emphasized that several doctors found that Green does not have any neurological problems. (Tr. at 59). He also pointed out that there is evidence that Green has normal strength and ability to use her joints. (*Id*.). He testified, further, that, while it is possible that Green's pain affects her ability to concentrate, the evidence suggests that her concentration is normal. (*Id*.). Dr. Goldstein also testified that Plaintiff had been diagnosed as suffering from endometriosis, for which she had recently undergone a hysterectomy. (Tr. at 58).

Dr. Goldstein concluded that Green should be limited to sedentary work, because she can lift five-pound items frequently and ten-pound items occasionally; that she can stand or walk for two hours in an eight-hour workday; and that she can sit for six hours in a workday. (Tr. at 60). He did testify, however, that it is "certainly possible" that pain would require a person with Green's condition to stop working for periods of time. (Tr. at 64-65). But he remarked that he had not seen "those kind of complaints in the record that there were several days at times that she couldn't get up or do anything." (Tr. at 65). In short, he testified that there was insufficient evidence that Green's condition affected her to the extent that she could not maintain employment. (Tr. at 64-65).

Finally, the ALJ heard from Byron Pettingill, a vocational expert. (Tr. at 65-71). Mr.

Pettingill based his opinion on the evidence in the record and on the hearing testimony. (Tr. at 65). Mr. Pettingill characterized Green's current bookkeeping job as "semi-skilled work" that "is customarily performed at the sedentary level of exertion." (Tr. at 68). He told the ALJ that a job as an "invoice control clerk" is similar to a bookkeeping job. (*Id*.). The ALJ then posed the following hypothetical question:

> Q      Now, assume an individual of the age 32 to 34 years, who has the equivalent of a high school education and at least a good ability to read, write, and use numbers, who has experience as a waitress, as a paralegal, as an administrative clerk, and as an invoice control clerk. Assume further that the individual has the residual functional capacity to perform work at the sedentary level of exertion. That is to lift five pounds frequently and ten pounds occasionally with mild to moderate pain and discomfort, and while performing at that level is in no other way limited posturally or environmentally. Could such an individual perform past work?
>
> A      The only work that could be performed with those limitations, Your Honor, is the work of an invoice control clerk.

(Tr. at 68-69).

After this exchange, Green's attorney, Robert Hardy, interrupted to inform the ALJ that he had found evidence that Plaintiff had a significant record of absenteeism. (Tr. at 69). He explained that Green's past employment records from Verizon show that she was fired because she missed work at least four-and-one-half days a month. (*Id*.). He argued that such evidence raises the issue of whether Green can maintain employment, even if she obtained work. (*See id*.). The ALJ gave Hardy the opportunity to include that evidence in a second hypothetical question to Mr. Pettingill. (*Id*.).

Before posing the hypothetical question, Mr. Hardy asked Pettingill whether new employees are typically hired for a probationary period, during which they can expect to be monitored more closely than others. (Tr. at 70). Pettingill responded that, in his experience, that practice is

26

common.  (*Id.*).  The attorney also asked Pettingill whether a person who missed more than three

days of a work month during that probationary period would be able to sustain employment.  (*Id.*).

Pettingill answered, "In my opinion, no, sir."  (*Id.*).  Hardy then posed the following hypothetical

question:

> Q      Okay.  The present work situation is one that -- where she's working on a
> part-time -- hypothetical individual working on a part-time basis, four hours a day
> on average, but given the latitude to come and go as they want through that -- can
> come and work an hour and leave or miss a day without jeopardizing their job.
> Would this be considered a normal work situation even for part-time?
>
> A      I don't -- you know, I don't know how you define normal, but . . . [i]t is not
> the most common kind of structure that people normally do.

(Tr. at 70-71).

With that, the ALJ concluded the hearing.  (Tr. at 71-73).

### The ALJ's Decision

Following the hearing, the ALJ made written findings on the evidence.  From his review of

the record, he concluded that Green suffers from fibromyalgia, and that the condition is "severe."

(Tr. at 22).  The ALJ also found that Green suffers from headaches, although they are not "severe."

(Tr. at 23).  He found, however, that Green does not have an impairment, or any combination of

impairments, which meets, or equals in severity, the requirements of any applicable Listing.  (*Id.*).

The ALJ further found that Plaintiff has the residual functional capacity to perform a full range of

sedentary work.  (Tr. at 24).  Drawing from the evidence, and in particular on the testimony from

Mr. Pettingill, the ALJ classified Green's past relevant employment as sedentary work.  (Tr. at 26).

With that, he found that Green is capable of returning to her past relevant work, as an "invoice

control clerk."  (*Id.*).  Ultimately, the ALJ concluded that Green was not disabled, or entitled to

benefits, and he denied Plaintiff's applications for DIB and SSI benefits.  (Tr. at 27).  That denial

prompted Green's request for judicial review.

It is well settled that judicial review of the Commissioner's decision is limited to a determination of whether it is supported by substantial evidence, and whether the ALJ applied the proper legal standards in making it.  *See Randall*, 570 F.3d at 655; *Newton*, 209 F.3d at 452 (citing *Brown*, 192 F.3d at 496).  Any conflict in the evidence is to be resolved by the ALJ, and not the court.  *See id.*  A finding of "no substantial evidence" is proper only if there are no credible medical findings or evidentiary choices that support the ALJ's decision.  *See Boyd*, 239 F.3d at 704.

As a preliminary matter, it must be acknowledged that Plaintiff has chosen to proceed without the benefit of counsel for this appeal.  It is well settled that the court applies "less stringent standards to parties proceeding *pro se* than to parties represented by counsel."  *Sanders v. Barnhart*, 105 Fed. Appx. 535, 536 (5th Cir. 2004); *accord Johnson v. Quarterman*, 479 F.3d 358, 359 (5th Cir. 2007).  As a result, while Plaintiff was represented by an attorney at the administrative level, her pleadings at the federal court level are nevertheless entitled to some deference.  *See id*.  It is clear, here, that Green is complaining that the ALJ failed to consider all of the relevant evidence, and that he improperly assessed her credibility.  (Plaintiff's Motion at 2-10; Plaintiff's Response at 3-11).  She argues that, as a result of those errors, the ALJ's decision was not supported by substantial evidence and, as such, must be remanded to the Commissioner for further proceedings. (Plaintiff's Motion at 10).

In her pleadings, Plaintiff argues that there is ample evidence that she is disabled due to her medical conditions.  (Plaintiff's Response at 3).  She points out that Dr. Gelders was her treating physician for a significant period of time, and that he consistently reported that she suffered from fibromyalgia.  (*Id*. at 6).  In fact, in his written opinion, the ALJ found that Green suffers from that

disorder, and he also determined that it is "severe." (Tr. at 22). With those findings, there is no issue on whether Plaintiff suffers from fibromyalgia. (*See* Tr. at 22-23).

But the ALJ also concluded that Green's fibromyalgia does not preclude employment. (Tr. at 24-26). He cited Dr. Goldstein's testimony in his finding that, "while the claimant has some pain, . . . she has normal strength and normal ability to function." (Tr. at 25). The ALJ relies heavily on Dr. Goldstein's testimony, despite the fact that he disagrees with the doctor's opinion that there is insufficient evidence that Green suffers from fibromyalgia. (Tr. at 22-25, 59-63). Further, the ALJ acknowledged Dr. Gelders's finding that Plaintiff "is disabled from now until the foreseeable future," but he dismissed that opinion, as follows:

> This opinion is not supported by the evidence of record or by specific assessment and/or treatment records. The opinion is conclusory, providing minimal explanation of the evidence relied on in forming that opinion; therefore, it is found less persuasive and afforded not [sic] weight.

(Tr. at 26). He stated that, in contrast, Dr. Goldstein's opinion deserves great weight because "[h]e is the only medical source who has reviewed the entire record." (*Id*.). The law is clear that an ALJ cannot reject a treating source's opinion without identifying specific, legitimate reasons to do so. *See Loza v. Apfel*, 219 F.3d 378, 395 (5th Cir. 2000); *Newton*, 209 F.3d at 453. Indeed, the Fifth Circuit has repeatedly held that, as a rule, "the opinions, diagnoses and medical evidence of a treating physician who is familiar with the claimant's injuries, treatment, and responses should be accorded considerable weight in determining disability." *Loza*, 219 F.3d at 395; *see Myers*, 238 F.3d at 621; *Greenspan*, 38 F.3d at 237. It is also true, however, that, "although the opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician, the ALJ is free to reject the opinion of any physician" when he has good cause to do so. *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987) (quoting *Oldham v. Schweiker*, 660 F.2d

1078, 1084 (5th Cir. 1981)).  The Fifth Circuit has explained that "[g]ood cause" to reject a treating

physician's opinion may exist when the treating physician's statements are "brief and conclusory,

not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise

unsupported by the evidence."  *Myers*, 238 F.3d at 62l; *see Greenspan*, 38 F.3d at 237; *see also*

*Newton*, 209 F.3d at 456.  But Fifth Circuit precedent is also clear that:

> A finding that a treating source medical *opinion is not well supported by medically*
> *acceptable clinical and laboratory diagnostic techniques or is inconsistent with the*
> *other substantial evidence in the case record means only that the opinion is not*
> *entitled to "controlling weight," not that the opinion should be rejected.  Treating*
> *source medical opinions are still entitled to deference and must be weighed using all*
> *of the factors provided in 20 C.F.R. § 404.1527 and 416.927.  In many cases, a*
> *treating source's medical opinion will be entitled to the greatest weight and should*
> *be adopted even if it does not meet the t*est for controlling weight.

*Id.* (quoting SSR 96-2p).  For that reason, a claimant is entitled to a remand if the ALJ rejects, or

gives little weight to, a treating doctor's opinion without considering each of the factors set out in

the Social Security regulations.[35]  *See Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 456.

On this record, the ALJ erred by dismissing Dr. Gelders's opinion as "conclusory" on the

ground that it "provid[ed] minimal explanation of the evidence relied on in forming that opinion."

(Tr. at 26).  By doing so, he ignored the fact that Dr. Gelders examined and treated Green for the

disease on numerous occasions, and over a significant period of time.  (*See* Tr. at 194-209, 262-66).

During these well documented examinations, Dr. Gelders discovered "multiple trigger points" and

---

[35] Those factors are as follows:
(1) the physician's length of treatment of the claimant;
(2) the physician's frequency of examination;
(3) the nature and extent of the treatment relationship;
(4) the support of the physician's opinion afforded by the medical evidence of record;
(5) the consistency of opinion with the record as a whole; and
(6) the specialization of the treating physician.
*Newton*, 209 F.3d at 456; *see* 20 C.F.R. § 404.1527(d)(2)-(6); *Myers*, 238 F.3d at 621.

tenderness that are common signs of fibromyalgia, and he ordered a variety of laboratory tests to further evaluate Green's condition.  (*See id.*).  The ALJ's summary rejection of Dr. Gelders's opinion does not provide any explanation for his failure to consider the doctor's specific findings relevant.  (*See* Tr. at 22-23).  Moreover, Dr. Gelders was not the only doctor to treat Green for symptoms commonly associated with fibromyalgia; Dr. Harner, Dr. Rhoades, Dr. Taylor, Dr. Nolan, and Dr. Bloodworth did so, as well.[36]  (*See, e.g.*, Tr. at 236, 249-52, 276, 506-16, 542-45).  Under these circumstances, the ALJ should not have rejected Dr. Gelders's opinion without first seeking clarification.  *See Newton*, 209 F.3d at 453.  It is well settled that, if an ALJ finds that "records are inconclusive or otherwise inadequate to receive controlling weight," but there is insufficient medical evidence to contradict the disputed assessment, then "the ALJ must seek clarification or additional evidence from the treating physician in accordance with 20 C.F.R. § 404.1512(e)."  *Id.*  A treating physician's records are considered "inconclusive" if they "contain[] a conflict or ambiguity that must be resolved"; if they do "not contain all the necessary information"; or if they do "not appear to be based on medically acceptable clinical and laboratory techniques."  *Id.* at 457 (quoting 20 C.F.R. § 404.1512(e)(1)).  Clearly, in this case, the ALJ should have sought additional evidence from Dr. Gelders before rejecting his opinion.  *See id.* at 453, 457.

It is worth noting, as well, the elusive nature of fibromyalgia.  *See Benecke v. Barnhart*, 379 F.3d 587, 589-90 (9th Cir. 2004).  It has been recognized that the cause of fibromyalgia,

> is unknown, there is no cure, and it is poorly-understood within much of the medical community.  The disease is diagnosed entirely on the basis of patients' reports of pain and other symptoms.  The American College of Rheumatology issued a set of agreed-upon diagnostic criteria in 1990, but to date there are no laboratory tests to

---

[36] Notably, Dr. Haymond, who performed a psychological examination on behalf of the state, also found that Green "does not appear employable . . . at this time."  (Tr. at 565).

confirm the diagnosis.

*Benecke*, 379 F.3d at 590 (citing *Jordan v. Northrop Grumman Corp.*, 370 F.3d 869, 872 (9th Cir. 2004); *Brosnahan v. Barnhart*, 336 F.3d 671, 672 n.1 (8th Cir. 2003)).   Common symptoms of fibromyalgia, such as "chronic pain throughout the body, multiple tender points, fatigue, [and] stiffness" are largely subjective matters.   *See id.* at 589-90 (citing *Brosnahan*, 336 F.3d at 672 n.1). The court in *Benecke* found that the "ALJ erred by 'effectively requir[ing] "objective" evidence for a disease that eludes such measurement.'"   *Id.* at 594 (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003)).   In this case, it must be emphasized that the ALJ found that Green does indeed suffer from fibromyalgia, and that the condition is severe.   (Tr. at 22).   And the record is replete with Plaintiff's subjective complaints of pain, and the limitations that she ascribes to her condition.   (*See, e.g.*, Tr. at 34-53, 169-77).   In his decision, however, the ALJ simply found that there was no objective medical evidence that Green is actually disabled because of fibromyalgia. Given the nature of this particular disorder, the subjective evidence deserved more consideration. *See Benecke*, 379 F.3d at 594.

The ALJ's decision is flawed for other reasons, as well.   For instance, the ALJ found that Plaintiff's symptoms appeared to be adequately controlled with medication.   (Tr. at 23, 25-26).   In so finding, he ignored evidence that, in fact, the few medications that provided Green relief caused her to suffer significant negative side effects.   (*See, e.g.*, Tr. at 206, 251-52, 445-91).   The law is clear that an ALJ should consider any side effects that "could render a claimant disabled or at least contribute to a disability."   *Loza*, 219 F.3d at 397; *see Crowley v. Apfel*, 197 F.3d 194, 199 (5th Cir. 1999); *Bowling v. Shalala*, 36 F.3d 431, 438 (5th Cir. 1994).   In addition, in finding that Green's condition was not disabling, the ALJ relied heavily on the fact that she was employed at the time

32

of the hearing.  (Tr. at 25-26).  However, this reliance was misplaced.  The evidence shows clearly that Green's job is a part-time one that allows her complete flexibility.  (*See, e.g.*, Tr. at 44-53).  It also ignores the fact that Green did not work, at all, from the alleged onset date in 2006, until she got the part-time job in May 2007.  (Tr. at 36-38).

Further, there is evidence that Plaintiff has "good days" and "bad days," and that she may be unable to maintain employment because of the frequency of her "bad days."  (*See, e.g.*, Tr. at 39-45, 52-53, 565).  It is clear that an ALJ is not required, in every case, to make a separate finding that a social security claimant who is capable of performing a job, will also be able to maintain that job.  *See Perez v. Barnhart*, 415 F.3d 457, 465 (5th Cir. 2005); *Frank v. Barnhart*, 326 F.3d 618, 619 (5th Cir. 2003).  "Nevertheless, an occasion may arise . . . where the medical impairment, and the symptoms thereof, is of such a nature that separate consideration of whether the claimant is capable of maintaining employment is required."  *Id*. (citing *Watson v. Barnhart*, 288 F.3d 212, 217-18 (5th Cir. 2002)).  Such a circumstance arises when, "by its nature, the claimant's physical ailment waxes and wanes in its manifestation of disabling symptoms."[37]  *Id*.  In this case, there is evidence that Plaintiff's condition "waxes and wanes."  (*See, e.g.*, Tr. at 39-45, 52-53, 565).  In light of the evidence, and given the elusive nature of fibromyalgia, the ALJ should address, on remand, whether Plaintiff is able to maintain a job, should she be capable of securing one.  *See Perez*, 415 F.3d at 465; *Frank*, 326 F.3d at 619; *Watson*, 288 F.3d at 217-18.

In addition, Plaintiff argues that the ALJ failed to consider other impairments which have an impact on her ability to work.  (Plaintiff's Motion at 3-4).  In particular, she complains that the

---

[37] The *Frank* court stated, "For example, if Frank had alleged that her degenerative disc disease prevented her from maintaining employment because every number of weeks she lost movement in her legs, this would be relevant to the disability determination."  326 F.3d at 619.

ALJ "failed to acknowledge evidence" concerning her stage-four endometriosis, and the resulting surgery.  (*Id*.).  She contends, as well, that the ALJ failed to question the medical expert witness about endometriosis and how it affects her ability to work, alone, or in combination with fibromyalgia.  (*Id*.).  She points out that she had undergone a hysterectomy and oophorectomy just six months before the hearing, and that she continued to experience "regular episodes of debilitating pain."  (*Id*. at 4).  In her application for benefits, Green also complained that she suffered from carpal tunnel syndrome.  (Tr. at 177).  It is well-settled "that in making a determination as to disability, the ALJ must analyze both the 'disabling effect of each of the claimant's ailments' and the 'combined effect of all of these impairments.'"  *Fraga v. Bowen*, 810 F.2d 1296, 1305 (5th Cir. 1987) (quoting *Dellolio v. Heckler*, 705 F.2d 123, 128 (5th Cir. 1983)).  In this case, the ALJ erred because he did not consider the combined effect of Green's impairments.

As the Fifth Circuit has explained, "where the rights of individuals are affected, an agency must follow its own procedures, even where the internal procedures are more rigorous than otherwise would be required."  *Newton*, 209 F.3d at 459.  If an agency fails to follow those procedures, and "[i]f prejudice results from the violation," then "the result cannot stand."  *Id*.  In social security cases, a claimant establishes prejudice by showing that, absent the errors, the ALJ might have reached a different conclusion.  *See id*.  In this case, Plaintiff was prejudiced, because if the ALJ had followed procedure, he might have reached a different result.  Because the ALJ failed to follow SSA procedures, and his failure prejudiced the claimant, his decision is not supported by substantial evidence, and is subject to reversal.  *See id*. at 452; *Ripley*, 67 F.3d at 557 & n.22.  For these reasons, this matter should be remanded, under sentence four of 42 U.S.C. § 409(g), on the issue of Green's impairments.  On remand, the ALJ must give due consideration to the evidence,

including the subjective evidence, of Green's impairments, as set out in this memorandum.  Given the nature of fibromyalgia, it would be wise for the ALJ to consult persons with an expertise in the disease, as well.  *See* 20 C.F.R. § 404.919(a); *Richardson v. Perales*, 402 U.S. 389, 400 (1971); *Turner v. Califano*, 563 F.3d 669, 671 (5th Cir. 1977).  Once such steps have been completed, the record will almost certainly contain sufficient evidence from which the ALJ can base a decision.  *See Ripley*, 67 F.3d at 555; *Wren*, 925 F.2d at 126; *Johnson*, 864 F.2d at 343.

**Conclusion**

Accordingly, it is **RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **GRANTED**, and that Defendant's Cross-Motion for Summary Judgment be **DENIED.**

It is further **RECOMMENDED** that this case be **REMANDED** to the Commissioner, as set out in this memorandum.

The Clerk of the Court shall send copies of the memorandum and recommendation to the respective parties, who will then have fourteen days to file written objections, pursuant to 28 U.S.C. § 636(b)(1).  Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208; copies of any such objections shall be delivered to the chambers of Judge Lee H. Rosenthal, Room 11535, and to the chambers of the undersigned, Room 7007.

**SIGNED** at Houston, Texas, this 15th day of October, 2010.

**MARY MILLOY**
**UNITED STATES MAGISTRATE JUDGE**

35